1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHARLES ERIC GERSITZ,

                        Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                        Defendant.

Case No. 3:11-cv-05085-KLS

ORDER REVERSING DEFENDANT'S
DECISION TO DENY BENEFITS AND
REMANDING FOR FURTHER
ADMINISTRATIVE PROCEEDINGS

Plaintiff has brought this matter for judicial review of defendant's denial of his

application for supplemental security income ("SSI") benefits.  Pursuant to 28 U.S.C. § 636(c),

Federal Rule of Civil Procedure 73 and Local Rule MJR 13, the parties have consented to have

this matter heard by the undersigned Magistrate Judge.  After reviewing the parties' briefs and

the remaining record, the Court finds that for the reasons set forth below, defendant's decision

should be reversed and this matter should be remanded for further administrative proceedings in

accordance with the findings contained herein.

FACTUAL AND PROCEDURAL HISTORY

On August 26, 2006, plaintiff filed an application for SSI benefits, alleging disability as

of August 1, 2003, due to attention deficit hyperactivity disorder ("ADHD"), a shizophreniform

disorder, anxiety, and leg pain and numbness. See Administrative Record ("AR") 8, 144, 165.

His application was denied upon initial administrative review and on reconsideration. See AR 8,

90, 95.  A hearing was held before an administrative law judge ("ALJ") on August 25, 2009, at

ORDER - 1

which plaintiff did not appear, but at which his attorney did, and at which a vocational expert also appeared and testified. See AR 62-87. A second hearing was held before the same ALJ on September 10, 2009, at which plaintiff, represented by counsel, this time appeared and testified, and at which another vocational expert appeared but did not testify. See AR 23-61.

On December 17, 2009, the ALJ issued a decision in which plaintiff was determined to be not disabled. See AR 8-18. Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on December 2, 2010, making the ALJ's decision defendant's final decision. See AR 1; see also 20 C.F.R. § 416.1481. On January 28, 2011, plaintiff filed a complaint in this Court seeking judicial review of the ALJ's decision. See ECF #1. The administrative record was filed with the Court on April 12, 2011. See ECF #9. The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits, because the ALJ erred: (1) in evaluating the medical evidence in the record regarding plaintiff's mental impairments; (2) in assessing plaintiff's credibility; and (3) in finding him to be capable of performing other jobs existing in significant numbers in the national economy. The Court agrees the ALJ erred in determining plaintiff to be not disabled, but for the reasons set forth below, finds that while defendant's decision should be reversed, and this matter should be remanded for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

ORDER - 2

support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

ORDER - 3

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. See Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.      Dr. Michels

A psychiatric evaluation was performed in early November 2006, by Paul Michels, M.D., who diagnosed plaintiff with chronic schizophrenia, paranoid type, and a possible schizotypal personality disorder. See AR 317. He assessed plaintiff with a global assessment of functioning

ORDER - 4

("GAF") score of 50,[1] and opined in relevant part as follows:

> He is a very impressionistic historian. I think this is a symptom of an underlying psychosis. Given his description of what appear to be delusions, I suspect that he suffers from Chronic Paranoid Schizophrenia. An alternative explanation may be Schizotypal Personality Disorder. Ongoing mental health treatment along with collateral sources of information would be helpful in clarifying diagnostic issues. He is involved in ongoing mental health treatment in the form of monthly counseling sessions. Generally, counseling has little efficacy with regards to psychosis. At present, the claimant's focus and concentration appear potentially moderately impaired. Pace and persistence seem fair. He probably has the intellectual capacity to understand, remember, and follow complicated or simple instructions. However, his thought disorder and impressionistic style of thinking may create unpredictable periods of time in which he would have difficulty completing specific tasks in a timely or consistent manner. Interactions with others may be moderately to significantly impaired. Stress may be met with schizotypal personality coping mechanisms. These may cause or perpetuate further psychosocial chaos and disruption. He probably has the basic capacity to manage his finances.

Id.

The ALJ found the conclusions of Dr. Michels to be "somewhat vague," but stated that they seemed to suggest plaintiff could work full time and that they were "otherwise consistent with the totality of the evidence." AR 17. Plaintiff argues the ALJ did not give any reasons for not adopting the conclusion of Dr. Michels that his thought disorder and impressionistic style of thinking "may create unpredictable periods of time in which he would have difficulty completing specific tasks in a timely or consistent manner." AR 317. The Court agrees. The only mental functional limitations the ALJ adopted were a limitation to "**simple tasks involving occasional to minimal interaction with others, especially supervisors and co-employees**," and to "**work**

---

[1] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV") at 34); see also England, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in general ability to perform basic tasks of daily life).

ORDER - 5

**that involves a low level of pressure**." AR 12 (emphasis in original).  Clearly, these limitations do not encompass any difficulty specifically in terms of unpredictability or completion of tasks, although pressure level could be expected to have some impact here.

Defendant argues the ALJ did not have to adopt any such difficulties, because the use of the word "may" rendered that opinion speculative and vague, and because Dr. Michels did not offer a definitive diagnosis.  But, as pointed out by plaintiff, the ALJ did not state in his decision that he was rejecting the conclusions of Dr. Michels on this basis.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (error to affirm ALJ's credibility decision based on evidence ALJ did not discuss).  In addition, while the ALJ did find those conclusions to be somewhat vague, it is not at all clear this was due to the use of the word "may", given that the ALJ failed to explain in what way or ways he found them to be vague.  To the extent the particular conclusion at issue here is vague, furthermore, Dr. Michels should have been re-contacted.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (ALJ's duty to further develop record triggered when evidence is ambiguous); 20 C.F.R. § 416.912(e)(1) (providing that medical source will be re-contacted to seek additional evidence or clarification, when that source's report contains conflict or ambiguity that must be resolved or does not contain all necessary information).

Defendant argues the ALJ properly rejected the findings and opinions of Dr. Michels, because he only evaluated plaintiff once for 15 minutes, and thus relied on plaintiff's less than credible reporting.  But as discussed in greater detail below, the ALJ erred in finding plaintiff to be not fully credible.  Nor is there any indication the evaluation took only 15 minutes, as the only reference to that period of time in the record, is the notation provided by Dr. Michels that it took plaintiff "about fifteen minutes" to travel to the evaluation by bicycle. AR 311.  In addition, as plaintiff points out, the ALJ did not state he was rejecting the above findings and opinions for

ORDER - 6

these reasons.  As such, they may not be used to justify the ALJ's rejection thereof.  See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (error to affirm ALJ's credibility decision based on evidence ALJ did not discuss).

      B.     Dr. Schneider

      Robert E. Schneider, Ph.D., evaluated plaintiff in early October 2003, noting in relevant that:

> He had a very contentious, subtly passive aggressive interactive style that would be expected to alienate co-workers and supervisors.  A lot of his discourse had an adolescent, ruminative quality that did not consistently make sense.  Discourse was frequently not understandable.  He had a concrete way of interpreting interactions. . . . There was some drama to his presentation. There were no florid schizophrenic mechanisms in his language, but thinking is clearly idiosyncratic and is dominated by a paranoid life position.

AR 249.  While plaintiff's mental status examination was fairly unremarkable (see AR 249-50), psychological testing of speed was "consistent with his report that he has repeatedly been fired because he has been too slow," though other testing suggested he could "do some things at an average speed" (AR 250).  Plaintiff's psychological profile, furthermore, was consistent with his presentation and with "a fixed delusional system with regressions into other irrational thought." Id.  Dr. Schneider further opined as follows:

> 1.     Charles has many characteristics of a paranoid personality disorder with peculiar if not psychotic thinking.  However, his thinking fits a pattern of paranoid distortions that are well organized.  It is possible this individual suffers from paranoid schizophrenia, but a more conservative diagnosis is paranoid personality disorder with a secondary diagnoses of schizophreniform disorder.  The schizophreniform diagnosis assumes regression into psychotic thinking.  A rule out diagnoses of paranoid schizophrenia will be presented.
>
> Age of onset was before the typical schizophrenic onset and his paranoid thinking seems to be fairly well circumscribed and there were no schizophrenic mechanisms in his discourse.  However, his paranoid thought process and delusional system certainly appear to

ORDER - 7

be "logic tight".

2.      This individual has been able to work.  He has been able to maintain
        jobs for one year, but has been repeatedly fired.  It is impressive that
        he has been able to maintain employment.  He can probably work in
        specific situations that are not dependent upon speed of productivity
        and that limit his interactions with others.  However, he is expected to
        continually have one type of difficulty or another when working.

3.      If he does return to work, he will require a tolerant supervisor.

4.      He states that he suffers from attention deficit hyperactivity disorder,
        but there was no evidence of attentional impairment.  He performed
        well on Digit Span, Trails B and Symbol Digit, all of which are
        sensitive to attentional impairment.

AR 250-51.

Dr. Schneider concluded that it was unlikely plaintiff would "cooperate with or benefit

from treatment," and assessed him with a GAF score of 46. Id.  At the same time, Dr. Schneider

completed a psychological/psychiatric evaluation form, in which he found plaintiff had several

moderate and one marked mental functional limitations, based on the diagnoses of a paranoid

personality disorder and a schizophreniform disorder. See AR 243-44.  Dr. Schneider further

stated therein that while mental health intervention "might be of slight benefit," it was "unlikely

to help a lot bec[ause] of [the] [p]ersonality [d]isorder." AR 245.

Plaintiff was evaluated again in late November 2004, by Dr. Schneider, who diagnosed

him with a schizophreniform disorder, rule out paranoid schizophrenia, a paranoid personality

disorder, ADHD (inattentive type), and a rule out schizotypal personality disorder. See AR 395.

Dr. Schneider found plaintiff's performance on his mental status examination to be "mixed", but

expressly noted that:

Language was confused and often "convoluted".  Sentences did not
completely hold together.  There was a slight flight of associations and some
distractible wandering from one topic to another.  It was notable that when he
was speaking about the specifics of his life and about concrete experiences, he

ORDER - 8

> was fairly lucid but once he started talking about "the world", reality testing was clearly impaired.  However, he is able to present lucidly in a way that obscures the underlying thought disorder which emerges when he has an opportunity to speak about good and evil and the horrible fate that he is absolutely certain will befall the United States.

AR. 392.  In terms of psychological testing, plaintiff fell "within the impaired range." AR 393. That testing also suggested "he would have considerable difficulty in a multi-task environment," and "indicat[ed] extreme distractibility." Id.  Further, "the tasks with which he had difficulties required him to perform a more active cognitive operation, which would be similar to work," and plaintiff could "be expected to be more fragile, vulnerable and more readily disorganized." AR 393-94.  Dr. Schneider stated as well that although plaintiff's psychological profile indicated he was "less agitated," he continued to experience "clinically significant depression" and generated "statistically high scores" in terms of both paranoia and psychoticism. AR 394.  Dr. Schneider concluded his evaluation report as follows:

> IMPRESSIONS:
>
> Charles describes symptoms of attention deficit disorder for which he is being treated with Strattera.  Performance on the current testing indicates considerable distractibility which is consistent with his reported problems while working.  The current data are consistent with a diagnosis of attention deficit hyperactivity disorder that is not sufficiently controlled with medications.  Testing indicates continued distractibility and limited ability to perform multi-task activities, also indicating that he would have difficulty in a multi-demand environment in which he is required to shift back and forth between tasks.  Testing is also consistent with his reported distractibility.
>
> Florid paranoid thinking appears to be better contained at the current time than it was during the previous examination.  During the previous evaluation, he presented with far more bizarre and uncontrolled mentation.  His delusional thinking appears to have become more circumscribed and better contained.  However, he does indicate that he continues to speak with "Jesus" on a regular basis and how "the U.S. is built on the seven sins, the horror of God's plan (relative to the U.S.) including the mass murders, mass riots and horrible things to come".  There is no information that this delusional thinking has interfered with his

ORDER - 9

ability to work or interferes in other areas of his life, but it certainly has the potential to interfere.

Dr. McCouch noted both the bizarre mentation, which he described as "bizarre social cultural interpretations of relationship . . . his belief that he can cause hallucinations at will and other socially odd interpretations". Dr. McCouch concluded, "I would definitely believe that it would be difficult for him to hold employment given his belief systems and his personal social interactions and thinking process. He certainly has had difficulty regarding his inattention".

I agree with Dr. McCouch. While his thinking is better controlled at the current time than it was during my previous evaluation, it continues to be idiosyncratic, bizarre and delusional. Testing also documents the reported attentional impairment. While he does not report that his delusional thinking has interfered with his ability to sustain employment, it seems more likely than not that it has manifest itself in his work relationships and would continue to do so in the future. His reported problems with attentional regulation at work are consistent with test findings. I agree with Dr. McCouch that it is very unlikely this individual could sustain gainful employment, even though he has been able to sustain several entry level jobs in the past. It is unlikely that this individual could reliably earn a living wage and support he and his family. Support of his Social Security Disability application is recommended.

DIAGNOSTIC FORMULATION:

The current examination is very consistent with my previous evaluation. Current findings do not cause me to alter my previous diagnosis or conclusions. The individual continues to exhibit characteristics of paranoid personality disorder with regressions into frank psychosis. Consequently, I believe that the diagnosis I previously provided continues to best fit the symptoms that have been observed. It does appear that he suffers from attention deficit hyperactivity disorder: inattentive type.

AR 394-95.

Dr. Schneider completed a third evaluation report in early May 2009, in which he noted plaintiff's mental status "was fair and certainly was not as abnormal as his thought processes." AR 398. Specifically, he "looked fine until he was asked about hearing voices," after which his "confusing, psychotic discourse followed with very little probing or questioning." Id. As further noted by Dr. Schneider:

ORDER - 10

> . . . He repeatedly volunteered one magical belief or another.  If one listens carefully, it is apparent that he does not make sense.  There were a number of times that he presented with spontaneous laughter that was not connected to any part of the interactions [sic] was apparently a reaction to some thought.

Id.  Again, with respect to psychological testing, plaintiff's profile indicated "severe depression with diminished psychological energy," along with "a significant paranoid psychotic disorder," anxiety, emotional distress, rumination and poorly regulated emotions. AR 399.  Dr. Schneider diagnosed plaintiff with paranoid schizophrenia and a rule out paranoid personality disorder, and he assessed him with a GAF score of 38.[2]

Dr. Schneider went on to opine in relevant part:

> Needless to say, [plaintiff] continues to exhibit a very significant psychotic disorder.  He seems to be able to contain it well enough to manage the demands of his life.  It is difficult to know how effectively he is parenting his children or what kind of environment he creates for them since his psychotic thinking is very close to the surface.

> . . . [I]t is extremely unlikely and more realistically impossible for this individual to sustain gainful employment.  His psychosis is barely contained and he already thinks that "a large percentage of people are garbage".  He would be expected to project onto his co-workers and develop a paranoid process that includes them.

AR 399-400.  In terms of prognosis, Dr. Schneider stated that it was "poor", as plaintiff seemed to be "very similar to the way he was when [he] saw him in 2003 and it appear[ed] that he [was] the same way that he was when he was hospitalized in 1998." AR 400.  Ability to manage funds also was "[a] concern due to his thought disorder." Id.  Finally, with respect plaintiff's ability to work, Dr. Schneider concluded:

> It is unlikely that he could accept direction and follow instructions since he is likely to read more into instructions than are actually there and read more into

---

[2] "A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." White v. Commissioner of Social Sec., 572 F.3d 272, 276 (6th Cir. 2009) (quoting Edwards v. Barnhart, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich. 2005)).

ORDER - 11

people's behavior than is actually there, as is typical of paranoid individuals. He said that he would need things repeated and could only remember one thing at a time and this is likely to be the case.  It is unlikely that he could tolerate pressures and demands of gainful employment or adapt to the social environment.

Id.

The ALJ rejected Dr. Schneider's findings and opinions for the following reasons:

Dr. Schneider's rating of the claimant's functioning is in direct contradiction with records from [the] claimant's treating mental health therapists and with the record as a whole.  In June, September and December 2007, January 2008, and January 2009, his mental health therapist rated his GAF at 60, which indicates only moderate difficulties in functioning (See Exhibit 22F).  It appears Dr. Schneider did not see these records or get information from [the] claimant's treating sources.  The treating sources had more contact with [the] claimant and were more objective in assessing his condition.  The treatment records are given more weight because of that.

Moreover, Dr. Schneider did not seem aware fully of [the] claimant's daily activities, such as art work, housework, biking, travel to Spokane, using public transportation, and reading books.  In addition, Dr. Schneider's concerns about the claimant's parenting skills seem to be unfounded.  The claimant testified he has been under direct scrutiny by child protective services since he obtained full custody of his children five years ago, and there is no indication in the record that there have been any consequences regarding this.  Also of note is that Dr. Schneider states his opinions did not change between evaluations, but there are some inconsistencies.  Notably, he initially found no evidence of ADHD, but on a later evaluation he found the claimant did have aspects of this condition.  He also rated the claimant's GAF significantly lower in his later assessment.  In addition, he initially found the claimant could probably work in specific situations that were not dependent upon speed or productivity and that limited his interactions with others, but later indicated the claimant was not employable.  For all these reasons, Dr. Schneider's opinions are given little weight.

AR 16.  Plaintiff argues these reasons for rejecting Dr. Schneider's findings and opinions are not

valid.  The Court agrees.

It is true that a GAF score of 60, which indicates only moderate functional difficulties, is

not consistent with the essentially disabling limitations found by Dr. Schneider.  See Tagger v.

Astrue, 536 F.Supp.2d 1170, 1173 n.6 (C.D.Cal. 2008) ("A GAF of 51-60 indicates '[m]oderate

ORDER - 12

symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'") (quoting DSM-IV at 34). In addition, while the opinion of a medical source who is not an "acceptable medical source" – such as a mental health therapist – may be given less weight than those of acceptable medical sources, evidence from such other medical sources may be used to "show the severity" of a claimant's impairments and their effect on his or her ability to work. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 416.913(a), (d) (licensed or certified psychologists are "acceptable medical sources").

Indeed, in some cases the opinion of a medical source who is not an "acceptable medical source" may outweigh that of an "acceptable medical source." Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 *5. "For example, it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." Id. Here, though, other than the GAF score of 60 (see AR 279, 406, 410, 412, 416, 423, 427, 440, 445, 452, 454), the ALJ points to no findings in the progress notes from plaintiff's mental health therapists that provide "better supporting evidence and a better explanation" than the detailed findings contained in Dr. Schneider's three evaluation reports (see AR 246-51, 390-400).

Nor does the record contain much more in the way of clinical evidence from those mental health therapists that contradicts Dr. Schneider's findings, or that should be deemed to be more reliable than such findings. See AR 263, 279, 282, 293-94, 364, 366, 402-03, 405, 419, 422, 432-33, 435, 448. As an examining physician, furthermore, Dr. Schneider was not required to rely on other evidence in the record – including evidence from plaintiff's therapists – in formulating his

ORDER - 13

opinions, which themselves constitute substantial evidence, unless the ALJ sets forth specific and legitimate reasons for rejecting them.  This the ALJ did not do.  In addition, there is no evidence, and indeed the ALJ fails to cite any, that plaintiff's therapists were "more objective" in assessing his condition than Dr. Schneider.  Accordingly, it was improper for the ALJ to give more weight to the opinions of plaintiff's therapists than to those of Dr. Schneider.

As for Dr. Schneider allegedly not being fully aware of plaintiff's daily activities, those listed by the ALJ – art work, housework, biking, traveling to Spokane, and reading books – are not inconsistent with the type of mental functional limitations Dr. Schneider assessed, which for the most part concern his ability to get along with others and tolerate the pressures of, and speed of production in, a work setting.[3]  The ALJ also did not provide valid reasons for dismissing the concerns Dr. Schneider had regarding plaintiff's parenting ability.  The fact that the record does not contain any evidence indicating there have been no consequences of the "direct scrutiny" of plaintiff by child protective services, does not mean there have not been or will not eventually be such consequences.  Indeed, it is not clear why such evidence would necessarily be included in the record.  Nor is there any indication that the ALJ – to the extent she deemed it to be important in this case – attempted to obtain such evidence or confirm that no such actual consequences had resulted from the child protective services inquiry.

As to the alleged inconsistencies the ALJ noted in Dr. Schneider's evaluations, this too the Court finds to be an unconvincing reason for discounting his opinions.  First, it is true that Dr. Schneider initially found "no evidence of attentional impairment" in early October 2003, as plaintiff performed "well" on the "Digit Span, Trails B and Symbol Digit" tests, all of which are

---

[3] The ALJ did also note that plaintiff used public transportation, which arguably involves dealing with others.  But the ALJ did not point to any evidence in the record, nor does the Court find any, that such use involved the type of interaction with which Dr. Schneider found plaintiff had difficulty.

ORDER - 14

sensitive to attentional impairment." AR 251.  In late November 2004, Dr. Schneider again "administered a number of tests that are sensitive to attention deficit disorder." AR 393.  One of those tests, which not administered before, was the "Brown Peterson Consonant Trigram Test, a test of divided attention and simultaneous information processing that is typically very difficult for individuals who suffer from attention deficit disorder." Id.

Plaintiff "was essentially unable to perform" this test. Id.  As Dr. Schneider explained, he "had extreme difficulty with this task and was incapable of the required simultaneous processing, suggesting that he would have considerable difficulty in a multi-task environment." Id.  Further, plaintiff's score "on the interference condition of the Stroop Interference Test" indicated as well that he had "extreme distractibility and difficulty filtering both distracting aspects of a stimulus and also distracting information and input." Id.  Thus, new objective clinical data was available to Dr. Schneider that was not previously.  The ALJ, though, did not consider this information or point to any other evidence in the record to contradict it or to lessen its credibility.  Nor is there any indication that the additional testing Dr. Schneider performed the second time was not more accurate than that which he administered initially.[4]

As for inconsistencies in the GAF scores, no such score was given in the evaluation Dr. Schneider completed in late November 2004. See AR 395.  Accordingly, no inconsistency exists between the first and second evaluations.  It is true that Dr. Schneider assessed a GAF score of 38 at the time of his third evaluation in early May 2009, as compared to the GAF score of 45 he

---

[4] Indeed, to the extent the ALJ's decision can be read to imply such additional testing was not more accurate or was less credible, such an implied finding would be improper, as the ALJ – without pointing to any medical evidence in the record to support it – essentially would be acting as her own medical expert. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) (ALJ should avoid commenting on meaning of objective medical findings without supporting medical expert testimony); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him).

ORDER - 15

assessed back in early October 2003.  It also is true Dr. Schneider stated in early May 2009, that plaintiff was "very similar to the way he was when" seen in 2003. AR 400.  Dr. Schneider also stated, though, that it appeared plaintiff was "the same way that he was when he was hospitalized [for schizophrenia] in 1998." AR 396, 400.

In other words, Dr. Schneider did not state as found by the ALJ that "no change" had occurred between the evaluations, but rather that plaintiff's condition in 2009 was "very similar" to that in 2003, with some apparent worsening thereof evident in 2009, as indicated by the lower GAF score and Dr. Schneider's comment that plaintiff appeared to be in a state that previously had resulted in him being hospitalized.  Further, to the extent there are some inconsistencies here, the Court notes the GAF scores of 48 and 38 both suggest the presence of very serious mental functional limitations – indeed, the higher GAF score of 48 itself is indicative of an inability to keep a job – sufficient to preclude substantial gainful activity.

Equally unpersuasive are the alleged inconsistencies between Dr. Schneider's initial and later opinions regarding plaintiff's ability to work.  As noted above, Dr. Schneider noted in early October 2003, that it was impressive that plaintiff had been able to work in the past, even though he had been "repeatedly fired," and opined that he could "probably work in specific situations that are not dependent upon speed of productivity and that limit his interactions with others." AR 251.  However, Dr. Schneider further qualified his remarks by stating that plaintiff would be "expected to continually have one type of difficulty or another when working," and that if he did return to work he would "require a tolerant supervisor." Id.

Also as noted above, in late November 2004, Dr. Schneider agreed "it would be difficult for [plaintiff] to hold employment given his belief systems and his personal social interactions and thinking process." AR 394.  Dr. Schneider also felt that plaintiff's delusional thinking would

ORDER - 16

continue to "manifest itself . . . in the future," and that it was "very unlikely" he would be able to

"sustain gainful employment," even though he had done so in the past. AR 395.  These remarks

are not so different from the ones Dr. Schneider made in early October 2003.  That is, while the

remarks he initially made are somewhat more supportive of a finding of an ability to work in

certain limited situations, both sets of remarks clearly indicate that to the extent plaintiff could

get work, he would have significant difficulties maintaining it.  Nor is Dr. Schneider's early May

2009 opinion that it was "extremely unlikely and more realistically impossible" for plaintiff "to

sustain gainful employment" (AR 399) so contradictory to his initial remarks – which, as just

noted, also indicate a strong likelihood that plaintiff would not be able to remain in a job should

he obtain one – as to justify rejecting Dr. Schneider's opinions on this basis.

C.    Dr. Quinci

Plaintiff argues the ALJ also erred in making the following findings:

> In March 2004, Charles Quincy, M.D., evaluated the claimant and opined the
> claimant had moderate functional difficulties due to social withdrawal,
> hallucinations and a thought disorder.  He diagnosed the claimant with
> schizophreniform disorder, paranoid schizophrenia, and atypical psychosis.
> He opined the claimant had a marked inability to relate appropriately to
> coworkers and supervisors, or respond appropriately to pressures of a normal
> work setting.  However, Dr. Quincy further opined the claimant was
> functional and could understand, remember and follow through with simple
> and complex tasks, with limited social interaction. (Exhibit 2F.)  His opinions
> regarding the ability to do simple and complex tasks and have limited social
> interaction are generally consistent with the record and are given some
> weight.  However, he only saw claimant briefly.  He is not given as much
> weight as those who treated claimant.

AR 16; see also AR 254-59.  The Court agrees the ALJ erred here.  First, it is not at all clear how

long Dr. Quincy's evaluation of plaintiff lasted.  Nor is it clear that it was any shorter than those

performed by Dr. Schneider or any other medical source.  Further, the ALJ has not pointed to

any evidence to establish or indicate that the time Dr. Quincy did spend with plaintiff provided

ORDER - 17

1    an insufficient basis for forming the opinions he gave.

2        In addition, although as noted above an ALJ may place greater weight on the opinion of a

3    treating medical source than those who do not treat the claimant, again the ALJ has failed to

4    show the progress notes of plaintiff's mental health therapists are more credible or reliable than

5    Dr. Quinci's findings.  Defendant argues it was proper for the ALJ to discount the findings of Dr.

6    Quinci for the additional reasons that Dr. Quinci saw plaintiff prior to his alleged onset date of

7    disability, that Dr. Quinci himself commented that plaintiff's reports of a history of ADHD were

8    "not supported by objective data" (AR 257) and that Dr. Quincy did not have the whole record

9    available to him when he evaluated plaintiff.  As plaintiff points out, however, the ALJ did not

10    state he was rejecting Dr. Quinci's findings for these reasons, and therefore they cannot be used

11    to justify that rejection.  See Connett, 340 F.3d at 874.

12    II.    The ALJ's Assessment of Plaintiff's Credibility

13        Questions of credibility are solely within the control of the ALJ. See Sample v.

14    Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this

15    credibility determination. Allen, 749 F.2d at 580.  In addition, the Court may not reverse a

16    credibility determination where that determination is based on contradictory or ambiguous

17    evidence. See id. at 579.  That some of the reasons for discrediting a claimant's testimony should

18    properly be discounted does not render the ALJ's determination invalid, as long as that

19    determination is supported by substantial evidence. Tonapetyan , 242 F.3d at 1148.

20        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent

21    reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what

22    testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also

23    Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the

ORDER - 18

claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

The ALJ in this case discounted plaintiff's credibility in part for the following reasons:

The claimant obviously endorses unusual beliefs. However, the record reveals his unusual or psychotic experiences have proven to not be a deterrent to his ability to work in the past, or to maintain, organize and manage his house and his children.

The claimant has described daily activities which are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations. They are active and independent. He testified he is able do all his housework, including cooking, cleaning, mopping, yard work, and grocery shopping. He also stated he has hobbies including art work, writing and reading. (See also Exhibits 20F/2, 3; 22F/3.) He stated he does some exercises in the morning, rode a bike until it was stolen in 2006, attended church, and is able to carry his groceries four blocks to his home. In November 2006, he rode his bike to an evaluation and was noted to sit comfortably without pain behavior during the evaluation. (Exhibit 6F.) In addition, the claimant has apparently been able to care for young children at home, which can be quite demanding both physically and emotionally, without any particular assistance. He testified he does everything that needs to be done to raise two children as a single parent. All of these factors weaken the claimant's credibility.

AR 13-14. The Ninth Circuit has recognized "two grounds for using daily activities to form the basis of an adverse credibility determination." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). First, they can "meet the threshold for transferable work skills." Id. To discount a claimant's

ORDER - 19

credibility based on this ground, the claimant must be "able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Smolen, 80 F.3d at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.  Under the second ground, a claimant's daily activities can "contradict his [or her] other testimony." Id.

Plaintiff argues that in regard to the first ground, the ALJ failed to show the activities he engaged in consumed a substantial part of his day or are transferable to a work setting. The Court agrees the evidence in the record concerning the amount of time plaintiff spent performing these activities is lacking.  In addition, while certainly some of those activities, such as housecleaning, are transferrable to a work setting, and belie to some extent plaintiff's allegations of disability on the basis of physical limitations, none of those activities are inconsistent with the difficulties the record shows plaintiff has had in terms of mental functioning, such as interacting with others and his unpredictability.  Further, because of the lack of detail regarding the extent of his activities of daily living, they do not necessarily contradict the other evidence in the record of his difficulties with speed, productivity and completing tasks.  For the same reasons, those activities also do not contradict plaintiff's other testimony regarding his mental impairments.  In addition, in regard to plaintiff's ability to parent, as indicated above, both Dr. Schneider's opinion on this issue and the evidence concerning child protective services involvement call that ability into question.

The ALJ also discounted plaintiff's credibility in part because:

> There is also evidence that the claimant stopped working for reasons not related to his allegedly disabling impairments. He stated he feels the last time he was able to work was 2005, when his leg pain became too much, but this is inconsistent with his testimony that he left his last job when he thought he had been hired somewhere else for more pay.  He stated after he put in his two weeks notice, he found out the new employer was not going to hire him.  He

ORDER - 20

then became a full time single parent.  The record suggests he has wanted to work since he left his last job, and his mental health counselors have felt he was employment ready, but he testified he has not explored trying to work since he left his last job and became a full time Dad. (Exhibit 4F/10.)  In addition, the record reveals that the claimant's allegedly disabling impairments were present at approximately the same level of severity prior to his alleged onset date of disability.  The fact his impairments did not prevent him from working at that time strongly suggests that they would not currently prevent work.  He admits he has always been able to work with his mental disorders. (See Exhibit 1F.)  Also, in February 2009, he reported he wanted to get a job, go to school and finish his GED. (Exhibit 22F.)  Although his earnings have never been at a very high level, his earnings records do reveal he has been able to perform substantial gainful activity in the past.  These factors further weaken the claimant's credibility.

AR 14.  Although the examples cited by the ALJ here do call into question somewhat plaintiff's credibility, the ALJ also appears to have ignored other evidence concerning plaintiff's past work that supports his testimony regarding his mental impairments and limitations.  For example, he has reported being fired from a number of jobs for being "too slow" or "not prompt enough." AR 248.  He also reported that he had been fired from jobs because he was "so distracted or he [was] spac[ing] off." AR 390.  Thus, it is not entirely clear that plaintiff "has always been able to work with his mental disorders" as found by the ALJ.  In addition, the mere fact that plaintiff reported wanting to get a job, go to school and finish his GED, does not mean he actually would have been able to do so at the time.  Accordingly, the Court finds the ALJ failed to provide clear and convincing reasons for discounting plaintiff's credibility here.

Lastly, the ALJ found plaintiff to be not entirely credible for the following reasons:

Of note is that although the claimant has received some treatment for the allegedly disabling impairments, the treatment has been essentially routine and conservative in nature and the record shows the claimant has failed to follow-up on recommendations made by his treating doctors. (See Exhibits 17F/I0, 11, 13, 16; 20F/2; 22F/19, 20, 21, 38, 42, 56.)  He sees a mental health counselor on a monthly basis, but admits he does not attend all his monthly sessions due to other commitments and the need to take care of his children.  Although several evaluators have recommended the use of prescription medications, there is no evidence in the record of the use of any medications

designed to treat psychiatric or mental symptoms.  He admitted he does not
take prescribed medications for his mental conditions because he has a fear of
medicine.  In addition, he has not had medical treatment regularly for his
alleged leg pain and he failed to show for a physical evaluation to assess his
alleged physical impairments, despite having the appointment rescheduled
once to accommodate his schedule. (See Exhibit 13F.)  These factors suggest
his symptoms have not been as serious as has been alleged in connection with
this application and appeal.

AR 14.  The failure to assert a good reason for not seeking or following a prescribed course of

treatment, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885

F.2d 597, 603 (9th Cir. 1989); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)

(upholding ALJ in discounting claimant's credibility in part due to lack of consistent treatment,

noting that fact that claimant's pain was not sufficiently severe to motivate her to seek treatment

was powerful evidence regarding extent to which she was in pain) Meanal v. Apfel, 172 F.3d

1111, 1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe and failure

of claimant to request serious medical treatment for supposedly excruciating pain); Johnson v.

Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription for conservative

treatment only to be suggestive of lower level of pain and functional limitation).

      Once more the Court agrees with plaintiff that the ALJ erred in discounting his credibility

for these reasons.  There is some evidence plaintiff has not been fully compliant with treatment

recommended or prescribed for his physical (see AR 376-77, 379, 382) and mental (see AR 391,

405, 420-21, 438, 442, 456) impairments.  But the ALJ did not adequately consider whether

plaintiff had a good reason for not fully complying therewith, at least in regard to treatment for

his mental impairments. See Carmickle v. Commissioner, Social Sec. Admin., 533 F.3d 1155,

1162 (9th Cir. 2008) (improper to discount credibility on basis of failure to pursue treatment

when claimant "has a good reason for not" doing so); see also SSR 96-7p, 1996 WL 374186 *7

(ALJ must not draw any inferences about claimant's symptoms and their functional effects from

ORDER - 22

failure to follow prescribed treatment, without first considering any explanations claimant may provide or other information in record which may explain that failure).

For example, as the ALJ himself noted, plaintiff admitted not taking medications for his mental condition for fear of medicine. Depending on the nature of that fear, this certainly could constitute a valid reason for not taking it, particularly if it is related to a mental impairment. See Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir.1989) (holding invalid ALJ's rejection of claimant's assertions regarding depression due to failure to seek psychiatric treatment, finding questionable practice of chastising one with mental impairment for exercise of poor judgment in seeking rehabilitation). Although it is not clear such is the case here, at the very least the ALJ should have investigated the possibility further before discounting plaintiff's credibility in part on this basis.[5] The ALJ also should have looked into plaintiff's report that he was not able to take medication for his ADHD because it "would affect his heart condition." AR 396; see 20 C.F.R. § 416.930(c)(4) (claimant may decline to follow recommended treatment "because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason [that it] is very risky for you").

The same is true regarding plaintiff's report of missing mental health counseling sessions due to "other commitments and the need to take care of his children," particularly as plaintiff is a single parent and therefore may have missed them for entirely valid reasons and not because of a lack motivation or desire to get better. There also is evidence in the record that plaintiff was prescribed and was taking medications for his ADHD in addition to the counseling he received

---

[5] Indeed, there is evidence in the record that plaintiff's mental health condition may affect his ability to comply with recommended treatment. For example, Dr. Schneider opined in early October 2003, that plaintiff was "unlikely" to "cooperate with or benefit from treatment," as "[c]haracteristically, individuals who suffer from paranoid personality disorder or paranoid schizophrenia resist medication treatment." AR 251; see Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (holding that fact that claimant does "not seek treatment for a mental disorder until late in the day" is not proper basis upon which to find claimant not credible regarding that condition, noting further that those with depression often do not recognize their condition reflects potentially serious mental illness).

ORDER - 23

1   (see AR 390-91), although admittedly this would call into question his report of not being able to

2   take such medication due to his fear or heart condition.   The point, however, is that the ALJ's

3   failure to fully consider plaintiff's reasons for not following or seeking treatment for his mental

4   health condition was error, and thus falls short of the clear and convincing standard required for

5   discounting plaintiff's credibility in this case.

6   III.   The ALJ's Findings at Step Five

7          Defendant employs a five-step "sequential evaluation process" to determine whether a

8   claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found

9   disabled or not disabled at any particular step thereof, the disability determination is made at that

10  step, and the sequential evaluation process ends. See id.  If a disability determination "cannot be

11  made on the basis of medical factors alone at step three of the evaluation process," the ALJ must

12  identify the claimant's "functional limitations and restrictions" and assess his or her "remaining

13  capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184

14  *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to

15  determine whether he or she can do his or her past relevant work, and at step five to determine

16  whether he or she can do other work. See id.  It thus is what the claimant "can still do despite his

17  or her limitations." Id.

18         A claimant's residual functional capacity is the maximum amount of work the claimant is

19  able to perform based on all of the relevant evidence in the record. See id.  However, an inability

20  to work must result from the claimant's "physical or mental impairment(s)." Id.  Thus, the ALJ

21  must consider only those limitations and restrictions "attributable to medically determinable

22  impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the

23  claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be

ORDER - 24

accepted as consistent with the medical or other evidence." Id. at *7.

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted).  The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

In this case, the ALJ assessed plaintiff with the residual functional capacity to perform a full range of light work, with the following additional limitations:

> **He can occasionally climb ladders, ropes, or scaffolds.  He can only occasionally stoop.  He can perform simple tasks involving occasional to minimal interaction with others, especially supervisors and co-employees.  He also can do work that involves a low level of pressure.**

AR 12 (emphasis in original).  At the first hearing, the ALJ posed a hypothetical question to the vocational expert that contained substantially the same limitations as were included in the ALJ's assessment of plaintiff's RFC. See AR 75-77.  In response to that question, the vocational expert testified that an individual with those limitations – and with the same age, education and work

ORDER - 25

background as plaintiff – could perform other jobs.  See AR 75-79.  Based on that testimony, the

ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the

national economy.  See AR 17-18.

Plaintiff argues the ALJ erred in so finding in light of the following testimony provided

by the vocational expert:

> . . . As far as a low level of pressure, one cannot predict that at all, so
> what could seem like a low stress or low pressure kind of setting with no
> decision making going on, no deadlines and so forth and so on, to another
> person, depending on the impairment could mean the minute they walk
> through the door. . . .  [I]t . . . presents circumstances that in the competitive
> work place one can't really gauge that. . . .

AR 77-78.  This testimony, plaintiff asserts, establishes that he cannot perform the jobs identified

by the vocational expert.  But as noted by defendant, the vocational expert went on to testify that:

> . . . As far as the low level of pressure, these jobs do not have decision
> making, they do not have deadlines other than to meet the productive
> standards each day of their job which they understand when they are trained
> and placed on the job.  Above that, there's no set gauge of pressure.

AR 78.  The vocational expert further testified that accordingly an individual with this limitation

could perform the jobs identified.  See id.  The Court thus finds no error here.

On the other hand, plaintiff points out and defendant does not dispute, that one of the jobs

the vocational expert had identified requires the ability to perform medium work (see Dictionary

of Occupational Titles, DICOT 922.687-058, 1991 WL 688132), which thus would be precluded

by the limitation to light work adopted by the ALJ.  In addition, it is not at all clear that plaintiff

would be able to perform the other jobs the vocational expert identified, given the ALJ's errors

in evaluating the opinions of Drs. Michels, Schneider and Quinci, including the very significant

mental functional limitations they assessed, and in discounting plaintiff's credibility concerning

his reported symptoms and limitations.  As such, the Court finds the substantial evidence in the

ORDER - 26

record does not support the ALJ's step five determination.

IV.     This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). As discussed above, the ALJ erred in evaluating the medical evidence in the record concerning plaintiff's mental impairments and in finding plaintiff to be not credible regarding his reported symptoms and limitations.  Plaintiff argues the findings and opinions of Dr. Michels, Dr. Schneider and Dr. Quinci, as well as his own self-reports and testimony, should be credited as a matter of law.  The Court agrees, but for the reasons set forth below finds that remand for further administrative proceedings, rather than an outright award of benefits, is more appropriate.

ORDER - 27

Where the ALJ has not provided adequate reasons for rejecting an examining physician's opinion, that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted). But where the ALJ is not required to find the claimant disabled based on such credited evidence, this constitutes an outstanding issue that must be resolved, and therefore the Smolen test will not be met. Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003). "In cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," furthermore, the Ninth Circuit "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116.

It is not entirely clear that the ALJ would be required to find plaintiff disabled based upon the findings and opinions of Drs. Michels, Schneider and Quincy. Dr. Quincy did assess plaintiff with a GAF score of 50, indicating the existence of serious symptoms or a serious impairment in social or occupational functioning, such as an inability to keep a job.[6] But because a GAF score "is not essential" to the accuracy of a claimant's RFC assessment, an ALJ's "failure to reference the GAF score" – or to give it substantial weight – in assessing a claimant's residual functional capacity "standing alone" does not make that assessment inaccurate. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). In addition, "the ultimate determination" as to whether a claimant is disabled is reserved to defendant, and thus "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean" that he or she will be found to be disabled.[7] 20 C.F.R. § 416.912(b)(7), § 416.927(e)(1).

---

[6] See AR 317. In addition, both Dr. Schneider and Dr. Quinci assessed plaintiff with scores indicating even more severe mental functional limitations. See AR 251, 259, 400.

[7] Dr. Schneider's opinions that it "would be difficult for [plaintiff] to hold employment," that it was "very unlikely" he "could sustain gainful employment," that it was "unlikely" he "could reliably earn a living wage," and that it was "extremely unlikely and more realistically impossible" for him "to sustain gainful employment," and his suggestion that plaintiff be granted disability benefits, thus would appear to fall into this category, and defendant, accordingly, would not be required to adopt them. See AR 394-95, 399. On the other hand, the findings and statements provided by Dr. Schneider, as well as by Drs. Michels and Quincy, "that reflect judgments about the nature and severity of [a

ORDER - 28

Dr. Michels, as discussed above, also opined in relevant part as follows:

. . . At present, the claimant's focus and concentration appear potentially moderately impaired.  Pace and persistence seem fair.  He probably has the intellectual capacity to understand, remember, and follow complicated or simple instructions.  However, his thought disorder and impressionistic style of thinking may create unpredictable periods of time in which he would have difficulty completing specific tasks in a timely or consistent manner.  Interactions with others may be moderately to significantly impaired.  Stress may be met with schizotypal personality coping mechanisms.  These may cause or perpetuate further psychosocial chaos and disruption.  He probably has the basic capacity to manage his finances.

AR 317.  Also as discussed above, Dr. Schneider stated that plaintiff could "probably work in specific situations that [were] not dependent upon speed of productivity," although he also would be "expected to continually have one type of difficulty or another when working," and he would "require a tolerant supervisor." AR 251.  Also at that time, Dr. Schneider found plaintiff to be markedly limited in his ability to exercise judgment and make decisions, and moderately limited in his ability to perform routine tasks and respond appropriately to and tolerate the pressures and expectations of a normal work setting." AR 244.

Later, Dr. Schneider commented that it appeared "more likely than not" that plaintiff's delusional thinking had "manifest itself in his work relationships and would continue to do so in the future," and that his "reported problems with attentional regulation at work [were] consistent with test findings." AR 395.  In his most recent evaluation report, Dr. Schneider further opined in relevant part:

. . . His psychosis is barely contained and he already thinks that "a large percentage of people are garbage".  He would be expected to project onto his co-workers and develop a paranoid process that includes them.

. . .

---

claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite [those] impairment(s), and [the claimant's] . . . mental restrictions" do constitute medical opinion source evidence the defendant may reject only for valid reasons. See 20 C.F.R. § 416.927(a), (b).

ORDER - 29

> It is unlikely that he could accept direction and follow instructions since he is likely to read more into instructions than are actually there and read more into people's behavior than is actually there, as is typical of paranoid individuals. . . . It is unlikely that he could tolerate pressures and demands of gainful employment or adapt to the social environment.

AR 399-400.

Dr. Qunci for his part found plaintiff to be markedly limited in his ability to respond appropriately to and tolerate the pressures and expectations of a normal work setting, exercise judgment and make decisions, and moderately limited in his ability care for himself, learn new tasks, control his physical or motor movements and maintain appropriate behavior. See AR 256. Clearly, the above findings and opinions establish the presence of significant mental functional limitations that would be expected to have a serious impact on plaintiff's ability to perform other jobs. The vocational expert, however, did not address those limitations in her testimony. See AR 75-83. The vocational expert did testify that an individual who was "markedly limited in terms of dealing with . . . work stress to the point they would miss two days of work a month," would not be able to maintain employment." AR 80. None of the medical opinion sources in the record, though, have opined that plaintiff would miss this amount of work.

The vocational expert testified as well that an individual also would be unable to maintain employment, if he or she could not sustain a work pace supervisors found to be inadequate. See AR 80-81. But as the vocational expert commented, if the pace is "not acceptable," than clearly that would cause a significant problem. Id. The question, however, is whether any limitations in plaintiff's speed or pace found by Drs. Michels, Schneider and Quincy would be unacceptable to supervisors. Again, the vocational expert did not provide such testimony. Accordingly, issues still remain as to whether plaintiff should be found disabled at step five based on the improperly discredited medical evidence.

ORDER - 30

As for plaintiff's improperly discounted credibility, it is true the Ninth Circuit has held that remand for an award of benefits is required where the ALJ's reasons for discounting it are legally insufficient, and "it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony." Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003).  To be found disabled, plaintiff must establish he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); Tackett, 180 F.3d 1094, 1098 (9th Cir. 1999).  But as indicated, a disabling impairment must be established by medical evidence, and not just the claimant's subjective symptoms. See 20 C.F.R. § 416.908. Thus, again because it is not yet clear that the improperly discredited medical opinion evidence supports a finding of disability absent vocational expert testimony, remand is the proper remedy here for resolution of this issue by defendant.

CONCLUSION

For the reasons discussed above, the Court finds the ALJ improperly concluded plaintiff was not disabled.  Accordingly, the Court hereby reverses defendant's decision and also for the reasons discussed herein, remands this matter for further administrative proceedings consistent with the findings contained herein.

DATED this 2nd day of November, 2011.


Karen L. Strombom
United States Magistrate Judge

ORDER - 31